Good morning, honors. I'm Michael Axline, appearing today on behalf of Plano-Pennapella's Gros Ventre Tribes, the Assiniboine Tribe, and the Fort Belknap Indian Community Council. With me at the council's table is Amy Atwood. Good morning. It's undisputed in this case that the federal government had a trust obligation to the Assiniboine and the Gros Ventre Tribes, arising from the Treaty of Fort Laramie, the Treaty with the Blackfeet, and the Grinnell Agreement. It is also undisputed, at least at this stage of the litigation, that the federal government violated these trust obligations to the tribes by allowing the diversion of water that ran onto the reservation from the island mountains and by allowing the destruction of the island mountains through Hippolyte Sinai money, in a way that foreclosed the tribes from using those mountains for cultural purposes. This was the finding of the Interior Board Land Appeal and a challenge to NEIS that the government prepared on its latest iteration of... I want to make sure I'm precise on this one. The U.S. violated the trust obligations by allowing the mining, now that was on land that did not belong to the tribes. That's correct. So your complaint is that the government allowed activities on lands that the tribes regarded as sacred but not that the tribes formerly owned. That's correct, but the tribes did have a right to the water that was coming from those mountains onto the reservation that was recognized and protected through the treaty. And we're also alleging that there was a violation of the trust obligation through the failure to act. So it was not simply granting permission to expand the mining operations, but it was the failure to act to protect the tribes' interests, and that is an ongoing violation of the government's fiduciary obligation. And what standards would we apply? Assuming we agree with your premise that there is a fiduciary obligation that surrounds the treaty, how do we determine whether that obligation has been breached without looking to federal laws, environmental laws, and how do we get past sovereign immunity? It seems to me that you want the advantage of sovereign immunity under Section 702, but you do not want to be constrained to the final agency action requirements of federal law in pursuing your breach of fiduciary duty claim. That is correct, Your Honor, and we think that the tribes are entitled to that, at least with respect to this claim, because the fiduciary breach claim is a common law claim. The fiduciary obligation arises from the treaty, but it's like any other common law claim that would be presented to a court for a decision. It's not a matter of imposing administrative standards to evaluate whether or not the violation of the fiduciary obligation occurred. It's a matter of determining as a fact matter whether the violation occurred. But we have to look to something to establish a duty in order to determine whether that fiduciary obligation has been breached. That is correct, and the place you look for that duty are the treaties. That's what establishes the duty. Other than the promise to, I forget the term, but to protect the tribe from the depredations, and I'll stop there, what else do I look at in the treaty that helps me to determine what the duty is that's owed by the United States to the tribe? That is where you look initially, but as the D.C. Circuit said in the Cobell v. Norton case, while the fiduciary obligations are rooted in the language of treaties and statutes, they are defined by equitable principles governing trust relationships. And so you look first to the treaties to find if there was in fact a duty, and then in the implementation of that duty you look to general trust principles. Mr. Axon, I could understand that argument if we were talking about a more traditional kind of a fiduciary obligation in connection with a trust, a financial obligation, for example, to handle the assets of the trust in such a manner that they're not wasted and that they are invested for the protection of the beneficiaries. The problem I'm having in connection with an environmental case is that's what the environmental statutes are written for, and there are very clear procedures that the government and all interested parties have to follow. And why wouldn't we look to those statutes to determine whether or not a breach has in fact occurred? Well, we're not arguing that those statutes are irrelevant, but we are arguing they're not the end of the story. For example, when it comes to water rights, the tribes have a right to water coming out of the island mountains onto the reservation that was protected under the Grinnell Agreement. The diminishment of water coming onto that reservation as a result of this mining operation is uncontested and admitted in the EIS. That's not something that is subject to general environmental laws such as NEPA or the National Historic Preservation Act. That is simply a property right that has been diminished by the government's action and failure to act in this case. So it doesn't require the act. There are no general public environmental laws that apply to that. It's not quite that simple. As I think Judge Bybee was questioning you a little earlier on, part and parcel of your theory of the breach is that the government failed to adequately regulate the activities of the adjoining property owners in order to prevent the leaching from occurring. Well, I would not use the word regulate here, Your Honor, because it's not – and I'm sure that you'll hear that from the government side, but when you're talking about a common law claim here, you're suing the government almost as if it was a private party, such as 702 is waive sovereign immunity of these kinds of claims. Yeah, but the common law claim is, you know, I own a mink farm, and my neighbor on the adjoining property starts dynamiting rocks, and my minks go crazy, and they kill one another. And I think there is a common law breach of fiduciary obligation to protect the rights of adjoining property owners. Here we have a different situation. It seems to me your claim is the failure of the government to act, to properly regulate the activities of the miners, is what has caused the depredation of the quality of the water. And so we have to look to those statutes in order to determine what duties were owed and how they were breached under your treaty theory, unless I'm missing something. Well, as Judge Malloy initially found in this case, before he sort of changed his approach sua sponte, as he admitted, while considering the summary judgment motions, the allowing of the contamination of water coming onto the reservation is very similar to the instance that you gave of an adjoining property owner dynamiting and causing damage to the mink farm. The government didn't push the plunger, but the difference is here, they've got a specific relationship with these tribes arising under specific treaties to stop that plunger from being pushed, and they didn't fulfill that obligation. And 702 does... Let me go back just a little bit. The land on which the mining activities occurs is not federal land. Is that correct? So we can't approach this under the ordinary common law principles of trespass or nuisance, in which we said you conducted your activities on your land in a way that's affected our land. Judge Tolman's example about the dynamiting affecting the mink, where you've altered the stream on your property in such a way that I've now slowed to a trickle and I've lost all my water rights, my irrigation rights. So this is a failure to regulate other property owners. And that is all... But the duty to regulate them is defined at its most specific level by federal statute and regulations, not by common law. But in this case, the difference, Your Honor, is that it's also governed by treaty. But you have a treaty which creates only the most general... On the ladder of abstraction, this is way up there because it doesn't tell the government what it's supposed to do. Does that obligation trump, let's say, if Congress were to do away with certain environmental statutes or if Congress were to amend certain statutes? Would the tribes have a claim that under their common law obligations that the government had a higher duty than what Congress had defined for them? Well, unless Congress provided specific protection, in other words, not only eliminated the environmental laws but also said affirmatively that the government had no obligation, then my answer to that is no, the tribes still have their claims. And with respect to the interference with the water coming onto the reservation, that's very close to the bottom of the run. On the ladder, I would suggest in terms of what the government's obligation is. We don't have a common law doctrine that really defines the relationship between a government and somebody that it's supposed to be regulating. If you have a common law claim, the common law claim generally governs two different parties, each of which owns property or conducting activities on their land. What you want is a common law trust obligation as to how the government is supposed to regulate a property owner. I'm struggling in my head to try and figure out what that obligation is under the common law. I agree with almost everything you said except for the last part. It doesn't have to do with how the government is supposed to regulate third parties. It does have to do with what steps the government should take in order to carry out the promises that it made to the tribes. And I would respectfully suggest that there is a fair amount of jurisprudence on that topic when it comes to treaty obligations to tribes and the federal government's trust obligation to those tribes. So although it doesn't involve land, it does involve a recognized fiduciary relationship between the government and specific entities. And that works in Cobell where you're talking about funds that the government was supposed to have and now has lost billions of dollars for the Indians. Correct. There you've actually got a... That's not necessarily a government to private party relationship. The government has stepped in and is executing the same kinds of obligations that a private fiduciary organization would be responsible if there were a bank. And so we do have a common law principle that tells us what fiduciaries, whether they're public or private, are supposed to do once they get funds. So Cobell sort of fits the model well. But this doesn't seem to fit the model particularly well because I don't know what the common law obligation is of a government to regulate somebody. Well, common law trust duties don't apply only to financial arrangements. They also attach to management of property. And if you're managing your property in such a way that it allows a third party on that property to damage somebody else's property, you're going to be liable under the common law. So I think there are a number of analogies, but the most relevant ones I believe are the cases involving Indian trust obligations arising under treaties that have to do with management of property. And the Nance v. EPA case in the Ninth Circuit was exactly that sort of case where the court held that the government's trust obligation to the two tribes that were involved there did extend to their regulatory activity. And it was truly regulatory activity, not what I would call management activity, off-reservation that had on-reservation impacts that were arguably contrary to the government's fiduciary obligations to the tribes. So I really don't think it's controversial that the fiduciary obligation extends to property, not just money, or that the obligation extends to off-reservation activities that result in harmful impacts on reservation. Can you get that out of the Grinnell Agreement as opposed to the Blackfeet Treaty? Well, we get them out of both, but I think the Grinnell Agreement is more specific to water. Let's take it one at a time, because I'm not sure the language in the Blackfeet Treaty helps you. I'm looking at the language that binds the United States, and I quote, to protect said Indians against depredations and other unlawful acts which white men residing in or passing through their country may commit. End quote. Why shouldn't I read that to mean acts that are only taking place on the reservation? There are a couple of reasons, the main one being that every rule of statutory or treaty construction that applies to agreements between the federal government and the tribes says that you are to construe those in the most generous way possible in favor of the tribes. But it's not ambiguous. I agree with you. The plain language talks about activities occurring on the reservation. What you want me to do is to construe it in such a broad way that it affects the activities of white men residing in or passing anywhere on or near the reservation. Well, two additional responses. One is that at the time of that agreement, the Grinnell lands were, in fact, part of the reservation. But secondly, a similar restriction that is not limited to the reservation appears in the 1851 Treaty of Fort Laramie. And so with respect to the depredations language, I think that does fairly extend beyond the reservation boundaries to activities that have harmful impacts within the reservation. Okay, and that would be Article 3 of the Fort Laramie Treaty of 1851. The United States binds themselves to protect the aforesaid Indian nations against the commission of all depredations by the people of the said United States. It's pretty broad, yeah. Now, what depredations means? Well, that was going to be my next question. Where do I look for the definition of depredations? Well, you have to look at it within the context of the treaty at the time. And one rule of statutory treaty construction that's sort of at the core of Indian law is that you interpret them as the Indians would have interpreted them at the time. That's a core rule of construction. And I think under any view, and, of course, this is not something that the district court ever addressed, but under almost any view, putting the world's largest heap-leach cyanide mining operation immediately adjacent to the reservation in an area that affects the water going onto the reservation that drives use of the mountains would be considered by the tribes at the time a depredation. Okay. Now, how do we get past the sovereign immunity problem? Because you want to bring a claim, a federal common law fiduciary breach claim, and why doesn't the general rule of sovereign immunity preclude you from bringing that claim unless it falls within the APA? Well, you do start with the APA, as we've said in our brief, Section 702, and the real issue I think that's been joined in the briefs is to what extent does Section 702 waive sovereign immunity. There's no doubt that it does, but the question is to what extent. The government argues that when Section 702 was adopted, it brought along with it all of the procedural provisions of the APA itself, and we suggest that that is not the case. Well, you like 702, you just don't like 704. Correct, although I think that this case would meet the requirements of 704 if it came to that, but we weren't really presented with the opportunity to make that argument to Judge Malloy. Well, I thought the district court, at least in what was at the – I get a little confused on the orders here, but the new pro tonque order, whatever that was dated, I thought what he ultimately concluded was that you had to show final agency action and that because you had not challenged the record of decision in 2002, that you were barred by the statute of limitation because you hadn't brought it within six years of the 1991 or whatever the date was. He did find that, but he didn't address another provision of the definition of agency action, which includes the failure to act, and there's an ongoing failure to act to address ongoing pollution coming on at the reservation at this time, and that is something, frankly, that we were prepared to address in detail in the remedies phase of the case until he issued his opinions on summary judgment. Our position was you can decide whether there's been a violation of the trust obligation based on the record that's before you. That's why we cross-moved for summary judgment. The evidence as to what equitable remedies were appropriate and should be awarded was lined up to be presented in what he had said would be phase two, but we never got to that stage. Can you address the Southern Utah Wilderness Alliance case? Yes, I can. That case involved a broad-scale challenge to an ongoing government program. Failure to act. Failure to act with respect to a broad nationwide program, and here what we have is a failure to act with respect to a specific obligation that runs to a specific tribe at a specific location in Montana, and I don't think even Justice Scalia would suggest that if the government is on the hook,  for a common law claim, that the failure to act discussion in SUA would somehow bar that claim from being prosecuted. His objection to it was that at the level of generality that the challenge was being prosecuted in SUA, the plaintiffs were essentially asking the court to stand in the shoes of the executive branch, and that was not permissible. But there's no risk of that here. In fact, I would suggest the opposite is true, since it is the courts that typically determine the merits of common law claims. By importing the APA and all of the regulatory and administrative steps of the APA into this common law claim as a defense, the government is inviting the court to relinquish some of its traditional powers to decide these kinds of claims. You want an order from the district court that essentially orders the affirmative damming or building of a filtration plant on the river? Well, I will give you a couple of examples, but I do want to emphasize that we haven't gotten to the remedies phase, and that should have been but was not briefed to the court. One specific remedy, however, that we would ask that court to do is to enjoin the government from allowing the continued diversion of water, the tribe's water, from the reservation. That's ongoing right now. It's a classic negative equitable remedy that the court could give us or any private water owner in a common law case. Couldn't you do that now anyway? Couldn't you bring another action that's ongoing? Well, I think we would get the same response from Judge Malloy because Malloy knew that claim was there and recognized it, in fact, earlier. She emphasized it earlier but nevertheless found But that's a different claim from the quality of the water. Now we're talking about not getting any water at all. Reduction in water, though, yes, and that's acknowledged in the EIS that the mining operations reduced the amount of water that was going onto the reservation as well as polluting it, the water that did make it to the reservation. So they're both of those kinds of claims. You have run out of time. I'll let you save some time for rebuttal, but the government does get an opportunity to respond. I'll address the 702.704 question in my rebuttal because I do think that's critical. Okay. Let's hear from the government. May it please the Court. I'm John Arbev on behalf of the appellees. I think Judge Tolman hit on one of the central issues in this case, which is what is the relationship between Section 702 and Section 704 of the APA? I think that as we tried to lay out in the brief anyway, Section 702 is a waiver of sovereign immunity for claims that seek non-monetary relief against the government. But along with the waiver of sovereign immunity, there are limits that Congress has placed on the waiver of sovereign immunity, and those are found in Section 704, one of which is the requirement of final agency action. Now, Judge Malloy in the district court, we believe, correctly recognized this relationship between Section 702 and 704. And he held that because the tribes had not challenged a final agency action falling within the applicable statute of limitations period, they could not pursue their claims for equitable relief against the United States. And yet we agree with you with regard to final agency action. What's your response, though, to the other half of that equation, which is the failure of the agency to act, which is ongoing? Yes, Your Honor. I think that that was also an issue that came up earlier, and Judge Huff, I believe, was on the right track to wonder whether that kind of a claim can survive after SUA. As I understand it, the tribe in their complaint alleged that under the FLPMA statute, the government had failed to prevent unnecessary or undue degradation of public lands in a way that was negatively impacting the tribe's reservation. Now, that, in theory, I think, is a claim that can be recognized under 706.1 of the APA. But under SUA, the Court was quite clear that a 706.1 claim can proceed only where the plaintiff asserts that an agency failed to take a discrete agency action that it is required to take. That, if I may point the Court to 124 Supreme Court at 2379, that passage of the discussion from SUA. Here, I think it's very difficult to say that a general statute like FLPMA or a general standard like unnecessary or undue degradation, it doesn't specify a discrete act that the government is required to take. It falls within the realm of generality that is generally left to the expert interpretation of the agency in deciding how it best can go about preventing unnecessary or undue degradation. So I think whether you look at the case from the 702.704 positive, perhaps, standpoint, or the FLPMA UUD unnecessary or undue degradation negative failure to act standpoint, there are considerable obstacles to the tribes proceeding on either front. And Judge Malloy was cognizant of the SUA problem. He recognized that the tribe was asking for a very broad declaration that the government had been in breach of its obligations to the tribes over a long period of time and was inviting the Court to essentially step into the shoes of BLM and devise a series of remedies that would be presumably undertaken without regard to the actual reclamation remedies that BLM had devised in 2001 and 2002. So it's quite clear that the district judge was aware of this problem. He addressed it. And we don't understand, really, the tribes to be making a contrary argument, at least in their briefs, on the 706.1 aspect of this case. In terms of the 702.704 aspect of the case, the strongest authority that we have for our position is, as we mentioned in the brief, this Court's fairly recent decision in the Gallo Cattle case where the Court described the waiver of sovereign immunity in 702 as having a number of limitations, including the final agency action requirement of Section 704. I also think that the Clouser v. Espy case is pertinent in this regard, and it's cited in the brief as well. The Court there made the point that the APA is a framework statute that provides the generally applicable means for obtaining judicial review of actions taken by federal agencies. And the analysis and the disposition of the district court in this case is completely consistent with that teaching from this Court's opinion in Clouser. Counsel, you have a proceeding that's still before the Department of Interior's Bureau of Land Appeals. Is there anything in that appeal? Is that appeal still pending? It is still pending, Your Honor. Okay. Is there anything in there that will affect the result in this case? I don't believe so, Your Honor. The tribes are asking for- There's no remedy that can be offered by proceedings that are currently pending for the Department of Interior that will ameliorate or cure any of the defects here that they're complaining of. Well, as I understand the appeal before the administrative tribunal, the tribes want the supplemental environmental impact statement to be remanded for further proceedings. Now, that claim is still pending, but I don't think- Is that EIS, is that related to any ongoing or planned reclamation? It concerns reclamation that was selected by BLM and which has largely been implemented. So there's nothing pending before the agency that will help the tribes out here? Well, the tribes have challenged the plan that was devised for reclamation by the BLM, and I suppose if the case were sent back by the IBLA to the BLM for further consideration, it may turn out that a different set of remedies would be devised by the agency, but we don't know that at this point. The reclamation- You're not claiming, then, that the tribes have a remedy for the Department of Interior that has not been exhausted? We're not making an exhaustion argument, Your Honor, no. I'd like to touch briefly on the two other issues that are presented by this case. The first issue, at least the first issue that was presented by the tribes in their opening brief, has to do with whether the district court acted within its discretion in granting summary judgment in favor of the United States at the close of the liability phase of the bifurcated proceeding. And I believe the short answer to that question is yes, the district court acted within its discretion because the district court's rulings in the October 22, 2004 decision concerned the liability of the United States and do not go to remedial issues, quote-unquote, that would necessitate factual development and briefing in the remedy phase of the proceeding. I would submit that the tribes' argument, to the contrary, overlooks the basis of the rulings in the court's October 22 decision, or that that's also known as the non-protunct order. The grant of summary judgment rests on a number of grounds, none of which truly implicates a remedial issue that should have been reserved to a remedy phase. The court ruled, for example, that the legal sufficiency of the 2001 supplemental EIS and the 2002 ROD for the mines was not before the court. The district judge ruled that the court's jurisdiction over the tribes' claims as asserted in their complaint depended on their identifying and challenging one or more final agency actions within the meaning of APA Section 704. The court also ruled that the tribes had not challenged a final agency action following within the six-year statute of limitations period prescribed by 28 U.S.C. Section 2401A. The court also ruled that the tribes lacked standing to challenge the vacated 1996 final EIS and record of decision. And the court also ruled that any challenge to BLM's approval of expansions of the mines was moved in light of the bankruptcy of ZMI, the mine operator and the closure of the mines. Now, I don't believe that any of those grounds on which summary judgment was granted go to issues that should have been properly reserved in some sense for a remedy phase of the proceeding. They were issues that went to essentially the liability of the United States that were properly resolved before a remedy phase was initiated. The other issue I'd like to touch briefly on is whether the court need to address the validity of the district court's statement that, quote, in the absence of a specific duty or specific control over tribal property, the government fulfills its obligations as a trustee to the tribes if it complies with applicable statutes. And I think Judge Tallman touched on this earlier as well. The short answer to this question is no, the court need not address the validity of that statement because it is dictum in this case, as the tribes at least seem to acknowledge a couple of times in their opening brief. In any event, the district court's dictum accurately states circuit law as exemplified by cases such as Okanogan Highlands and Morongo Band. And I would submit that if the tribes disagree with those, the principle embodied in those cases, it would be incumbent upon them to bring their objections to the court sitting on Bonk and not to a panel of this court. If there are no further questions, I would conclude by asking this court to affirm the judgment of the district court. Thank you. Anything else? Thank you very much. With respect to Section 704 and whether it's imported into the waiver of sovereign immunity in 702, I want to address the language of Section 704 and then bring to the court's attention a recent case that I think both sides missed that I think has some bearing on this. The language in Section 704 that I'd like to bring your attention to is in the first sentence. Section 704 describes actions reviewable and says that agency actions made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. This exception to Section 704 takes cases in which there is an adequate remedy in a court out of the provisions of the APA, as the D.C. Circuit found in the National Wrestling Association. But that is a bit ‑‑ I think you're begging the question by taking that position because I come back to the question I asked you at the very beginning of the argument, which is what do we look to in order to determine what the duties were? And an easy way to answer my question, which doesn't help your position, is we look to the specific environmental statutes that address the activities of the adjoining landowner and the need for final agency action in carrying out those statutory obligations which, if complied with, should meet the obligation that you urge that the United States owes the tribes under its treaty obligations. Well, part of my answer I'll repeat, which was that you look to the specific treaty language, and those treaties must have some meaning, and they're with the tribes. They're not with the general public. So to say that the obligation can be satisfied by doing what the government does for every other citizen of the country doesn't really ‑‑ it takes away all meaning from those treaties. It really does. And you're left with nothing other than the tribes are the same as everybody else, and these treaties didn't give them anything that anybody else doesn't have. We didn't have the environmental statutes at the time that the treaties were enacted. Well, the fact that the United States has now undertaken to prescribe a whole scheme for caring for the environment doesn't mean that the tribes are entitled to something in addition to what Congress has specifically provided for. Or that other landowners won't be benefited by, who are downstream, won't be benefited by the government complying with its statutory obligations. Well, there's no question but what the statutory requirements serve a salutary purpose, but I think my point that they benefit everybody equally and the tribes not specifically is valid whether you're looking at the time of the treaties or today. These treaty obligations are ongoing. They're to be interpreted as the tribes interpreted them, not as Joe Citizen interpreted them at the time that the treaties were adopted. And they're to be given life by equitable principles, as the court held in the Cobell case. Well, maybe you should turn to what you allege to be dictum in the district court's opinion because that does seem to be a phrase that comes directly from Ninth Circuit case law in terms of identifying how we determine the duties and obligations. No question about that, Your Honor, and we will concede that. And I want to address that, but before I do, I don't want to forget to give you this case that was not cited in either briefing. The case is Magera, M-A-G-I-E-R-A v. Norton. It was decided September 2nd, 2004, and the site to it is 108-Fed-A-P-P-X-542. I mean, it's an unpublished opinion, right? Then maybe that's what it was. I don't know. It's 108-Fed-A-P-P-X-542. And if this means it's an unpublished opinion, it doesn't. Which circuit? The Ninth Circuit. Yeah, that's what it means. It's an unpublished opinion. I'm going to withdraw. We won't hold you. In doing this search before the argument, we came across it. So how about turning then to my question, which is really the fundamental power of this panel, to do anything other than follow the prior established law. Just briefly, the reason that we think that those prior cases were decided incorrectly is because they equated the trust obligation that arises from specific treaties and requests for equitable remedies with the trust jurisprudence that the Supreme Court adopted in Mitchell that applies to claims for monetary damages in Indian Tucker Act cases. And there the Supreme Court said you have to find a specific statutory basis for your claim that you have a treaty right to recover monetary damages. And in 2003, the Supreme Court decided a pair of cases under the Indian Tucker Act, the White Mountain Apache case and the Navajo Nation case, in which they reiterated that general principle but also took pains to distinguish general trust principles that apply to tribes when they're not making monetary claims under the Indian Tucker Act. And the sequence of cases in the Ninth Circuit that culminated in the Morongo Band case took a D.C. Circuit case involving non-Indian Tucker Act claims that applied to this. You've got to find basically a private cause of action under a statute and pair it with the Indian Tucker Act analysis and just imported it uncritically into an assessment of general Indian trust principles. And that case has now been followed in several cases in the Ninth Circuit. And I acknowledge that this is something this panel is powerless to do anything about except perhaps note the absence of any recognition of that distinction in the prior opinions, after which a request for on-bank review would then be appropriate. Okay. Counsel, I've allowed you to go way over, but I very much appreciate it. And I want to speak on behalf of the panel. The arguments on both sides was very enlightening, and the case just argued is submitted. We'll get you an answer as soon as we can figure it out. And I can't promise you exactly how or when that will be, but we'll give it our best effort. And we stand adjourned until tomorrow morning. Thank you. All rise.
judges: Tallman, Bybee, Huff